IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 39710-6-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| JOHN THOMAS EDWARD CLARK, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

FEARING, J. — At the request of the State of Washington, we previously remanded

appellant John Clark's sentence because the superior court considered impermissible

circumstances when granting an exceptional downward sentence. Clark now asks that we

remand again for a second resentencing. We grant Clark's request because of uncertainty

as to whether the superior court properly exercised its discretion during the first

resentencing.

## FACTS

A no-contact order prohibited John Clark from any contact, even through a third

party, with his ex-wife Jane, a pseudonym. Between February and April 2020, Clark

violated the order four times. The superior court simultaneously sentenced Clark for

these four violations on May 19, 2020.

During July and August 2020, John Clark contacted Jane numerous times through Facebook and through Jane's mother, H.T. John sent H.T. pictures via Facebook messenger of handwritten letters addressed to Jane and signed by him. He asked H.T. to forward the messages to Jane.

On December 8, 2020, the State of Washington charged John Clark with a felony violation of a no-contact order. The offense rose to the level of a felony due to Clark having at least two earlier convictions of violating the order.

On January 14, 2022, John Clark pled guilty to the felony charge of violating a court order. Because Clark's offender score was 8, the standard range sentence for his offense began and ended at 60 months. In exchange for Clark pleading guilty, the State agreed to recommend, at sentencing, a prison-based Drug Offender Sentencing Alternative (DOSA) consisting of thirty months of incarceration and thirty months of community custody. The statement of plea of guilty read, in part:

> (j) The prosecuting attorney will make the following recommendation to the judge: Agreed recommendation for Prison DOSA.

Clerk's Papers (CP) at 7.

At John Clark's sentencing hearing, the State requested imposition of the DOSA sentence reflected in the plea agreement. In response, defense counsel remarked:

> The day I met Mr. Clark probably about eight or nine months ago he told me he wanted to take responsibility for his actions, told me he was ready to plead guilty, but the offer on the table was this; it was prison DOSA where he would have to derail the past two years of his

2

rehabilitation, his getting sober, getting his life on track to go to prison for 20 months at best with good time. And so for the past nine months I've been working with the State in attempt to find a resolution that would allow Mr. Clark to potentially not spend nearly two years in custody followed by DOC [Department of Corrections community custody].

DOC isn't his concern. He knows he'll be able to be compliant with that. It's really going to prison, taking two years off work, child support payments, all of those things and having to kind [of] get back out of custody and start his life over again for however many-th (sic) time.

. . . [H]e knows that he violated this no contact order back in November of 2020, but he's gotten sober, he's gotten clean. Since November of 2020 as far as I'm aware there haven't been any allegations of violations of a no-contact order. I'm sure the State would have informed me if there were. So he's been good, and he's done what he needs to do.

It's unfortunate that the [SRA] is structured the way it is. The law is the law and no-contact orders are such a procedural charge that it's easy for the State to prove at trial. Mr. Clark didn't want to put the community through that; he didn't want to put his family and friends through that, or the victim through that. So he's taking responsibility and he's ready to enter his guilty plea.

I think the only way and I told Mr. Clark this, the only way I would have been able to help him is to go back in time, never leave the prosecutor's office, be the assigned DPA [deputy prosecuting attorney] on this case, and have a little empathy for the journey that he's gone on, and the changes that he's made in his life. This is a hard one for me, Your Honor, to sit here and have Mr. Clark booked into custody today knowing that for the next two years he's going to have to sit still, and as an addict he's going to have to be really, really structured when he gets out of custody and be very focused. He knows he can do it; I know he can do it, but it's hard to sit here and know that transport is coming to take him away for two years.

CP at 56-57 (some alterations in original).

The sentencing court imposed an exceptional sentence below the standard range, which sentence consisted of six months of incarceration and twelve months of community custody. The court also imposed a five-year no-contact order. The

3

sentencing court found that four factors warranted a departure from the standard range sentence: (1) John Clark engaged in post-arrest rehabilitation, (2) Clark's earlier no-contact order violations were sentenced on the same date with the offenses having been committed in a narrow period of time, (3) since Clark's violative communications were in writing, the State and the court knew all the substance of his improper communications, and (4) Clark's communications to his ex-wife and her mother were not threatening, intimidating, or violent.

The State appealed John Clark's sentence to this court. The State asked for resentencing because the law did not approve of any but one of the sentencing court's bases for a downward sentence and because defense counsel implicitly breached the plea agreement at sentencing by undermining the parties' recommendation for a prison-based DOSA.

On February 21, 2023, this court issued its opinion that remanded John Clark's prosecution for resentencing. In discussing whether Clark's minimal misconduct justified an exceptional sentence on its own, this court wrote:

> While the legislature has recognized some different degrees of offense conduct in setting the penalties for violations of no-contact orders, the conduct sufficient to qualify as a felony under the statute of conviction, former RCW 26.50.110(5) (felony based on two or more prior convictions), can vary widely. On the aggravating side, a defendant with two or more prior convictions might violate the no-contact order by assaulting the protected party. On the mitigating side, a defendant with two prior convictions might violate the statute by a peaceful interaction that was initiated by the protected party. Our case law recognizes that if the

4

defendant's conduct falls on the extreme end of the proscribed behavior, a departure may be warranted. *See, e.g., State v. Fisher*, 108 Wn.2d 419, 739 P.2d 683 (1987).

Mr. Clark's offense conduct included both aggravating and mitigating circumstances. In aggravation, Mr. Clark had more than two prior no-contact order violations and, according to the factual basis for Mr. Clark's guilty plea, Mr. Clark contacted his ex-wife on numerous occasions as part of the current offense. The State could have charged Mr. Clark for each separate violation, but chose not to do so. In mitigation, Mr. Clark's prior no-contact order violations were all part of the same criminal case. Mr. Clark's instant violations occurred in writing rather than in person, and the content of Mr. Clark's written communication appeared not to have contained any threatening content.

Given the existence of both aggravating and mitigating circumstances, we doubt whether Mr. Clark's conduct can be fairly characterized as de minimis. Furthermore, the record lacks any input on these issues from Mr. Clark's ex-wife. It is therefore impossible to assess whether, given Mr. Clark's relationship with his ex-wife, his communications with her were interpreted as upsetting or threatening.

We need not definitely decide whether the facts in this case are insufficient to justify an exceptional sentence downward. Because, as set forth above, the sentencing court incorrectly relied on several impermissible factors in imposing an exceptional sentence downward remand is required as we cannot discern whether the court would have opted for an exceptional sentence downward based solely on the de minimis nature of Mr. Clark's offense. *See, e.g., State v. Henshaw*, 62 Wn. App. 135, 140, 813 P.2d 146 (1991) (Remand is necessary where the sentencing court placed considerable weight on invalid factors, even if other factors were valid.). *On remand, the record may be enhanced by additional information. If on remand the sentencing court finds Mr. Clark's offense conduct was de minimis in a manner not contemplated by the legislature, and both compelling and substantial, an exceptional sentence downward may be warranted.*

CP at 65-67 (some emphasis added) (footnote omitted).

In addressing the second issue on appeal, this court determined defense counsel's

actions at sentencing did not constitute a breach of the plea agreement. Nevertheless, it

5

cautioned defense counsel about how to proceed on remand:

> We note that on remand defense counsel's posture will be much
> different. Now that there is a well-defined basis for an exceptional sentence
> downward, defense counsel must take care not to undermine the parties'
> plea agreement and suggest the court impose anything other than the agreed
> DOSA.

CP at 69.

In anticipation of resentencing, DOC filed a Request for a Discharge on March 14,

that read:

> Mr. Clark adjusted well to Community Custody Supervision with the
> Department of Corrections (DOC). He obtained a full-time job with Faith
> Man Handy Man Services, within a week from being released from serving
> his Original Jail Time and is currently employed with the same company.
> Mr. Clark completed his Court Ordered Substance Abuse Evaluation, and
> no further treatment was recommended. Mr. Clark has remained violation
> free during his time with DOC, all his drug tests have been negative, and he
> paid his legal financial obligations in full. He not only successfully
> completed all the Court's and DOC requirements, but he also bettered his
> personal life. He attends Church regularly, he got married, secured a home
> for him and his wife, and obtained a driver's license. Mr. Clark is one of
> the few who have demonstrated that he can be a prosocial member in the
> community.

CP at 102.

## PROCEDURE

On April 7, 2023, the superior court resentenced John Clark. In the meantime,

Jane, the crime victim, filed an impact statement that described Clark's emotional and

mental abuse of her and their three children, his alcohol and drug abuse, Clark's

abandonment of the family, his stalking of Jane after the abandonment, his theft of Jane's

6

car, and the trauma suffered by her and the children.

The State, before the resentencing hearing, delivered a letter from the victim of the crime, John Clark's ex-wife. During the resentencing hearing, the following colloquy occurred before the court and the prosecuting attorney:

> MR. MARTIN [the State's attorney] . . . I did want to let the Court know that the victim in the case is present here today, and I wanted to inquire if the Court got the—the just about page-and-a-half victim statement?
> THE COURT: I did not.
> MR. MARTIN: Judge, I've got—I've got a copy here.
> THE COURT: Thank you.
> MR. MARTIN: I believe it's been provided to defense.
> . . . .
> THE COURT: Let me—let me verify that. I went through — oh, Counsel, I take it back. I did get that and I did read it. I'm sorry, I did read that.
> . . . .
> THE COURT: Given that at a resentencing the court can consider pertinent information that's occurred subsequent to the sentencing, is there anything I should be aware of?
> MR. MARTIN [the State's attorney]: Judge, the only comment that I would make in those regards is on the one hand, obviously we want to see a defendant, especially a defendant that's got, you know, a significant criminal history and a number of DV convictions, we want to see that defendant do something that makes it less likely that he is going to reoffend, less likely he's going to put other people in danger and become a productive member of the community. And those things are all commendable, and I understand that the Court's going to look at those. But I think it's also important to remember that a lot of defendants who go straight from plea, to sentencing, to prison on a negotiated settlement don't get a chance to be out in the community and to make the improvements and take the actions that they could come back on at the time of resentencing to show, "Hey, you know, I'm not the person you think I am. This is what's been going on in my life these last couple years." And I'm not saying that it's unfair that the defendant had that chance where other defendants didn't

7

have it, but I do think that it's something that should weigh in the Court's mind when you're assessing what the appropriate approach is.

The parties did work on this case. They did come to an agreed settlement. I understand all of Ms. Coic's arguments, and I—I believe they're all made in good faith and they all point to relevant information. But at the end of the day, this was an agreed settlement. It is a settlement that—it not only has some accountability in it but also takes the midpoint of the standard range and cuts it in half. So there is a palpable benefit that was achieved by Ms. Coic's negotiations with Mr. Welde. It reduced the sentence the defendant otherwise would have been looking at almost by half, maybe more than half if he would have gotten the high end. And it also gives him the opportunity to have the state pay for his treatment, which should be something that benefits him in the long term.

So again, it's just a lot for the Court to keep in mind, but I think all those things—

THE COURT: But no—

MR. MARTIN: ought to weigh in.

THE COURT: No known facts to the state regarding probation violations or not following up with—with the court's original sentence or violations of a no contact?

MR. MARTIN: I am not aware of any—

THE COURT: Okay.

MR. MARTIN:—new violations or—

THE COURT: No new crimes?

MR. MARTIN: And from what I understood from the materials provided by Ms. Coic, it sounds like he was discharged from Department of Corrections. So I'm assuming that they didn't have an issue with him or they wouldn't have discharged him.

THE COURT: Thank you very much, Mr. Welde—not

Report of proceedings (RP) at 4-9.

During the resentencing hearing, defense counsel next spoke and the resentencing court asked more questions. MS. COIC [defense counsel]: Your Honor, I would like to inquire if the state has anyone that is—I know he—Mr. Martin mentioned that the victim did not want to speak. Was there anyone else that, Mr. Martin, that you wanted to speak today before I start?

THE COURT: Did the victim advocate or anyone wish to address the court? I have reviewed the letter, and I'm aware of her position.

VICTIM ADVOCATE ANNETTE INGHAM: Nobody else from the state, your Honor. Thank you.

. . . .

MS. COIC: And, your Honor, Mr. Clark would like, if the Court would entertain it, for his wife to make a statement on his behalf before I speak.

THE COURT: That's appropriate in the sentencing, no problem.

. . . .

THE COURT: What's his sobriety been like?

MS. CLARK: What's his sobriety been like? Um, he—I mean, he's—I've watched him grow over the last three years, and he has been completely sober except for he—sometime a couple years ago he had a one-day—it was a year and a half ago he had a one-day relapse and that was it. And he does Celebrate Recovery. We go to church every Sunday. He goes every Saturday to a men's Bible study, and he has a huge support system. And he is really confident in his sobriety now, yeah.

RP at 9-12.

Defense counsel spoke, at the hearing, about John Clark's behavior while in DOC custody. Although both parties requested that the resentencing court impose the agreed-upon DOSA outlined in the original plea agreement, defense counsel noted:

I'm aware that I am bound by the joint recommendation that was recommended to this court back in January of 2020 to—for a 30/30 prison DO SA. I think it's important—like the Court noted to Mr. Martin, the Court is allowed to consider subsequent evidence information that has come forward since sentencing.

. . . .

I know he wants to speak to the Court as well but -for his actions prior to him gaining his sobriety. But this chance that the Court gave him back in January of last year panned very—very well for him and for this Court as a success story. So while I am bound by the recommendation, I think those are very important things for the Court to note.

In my reading of the Court of Appeals' opinion, they did not state that an exceptional down sentence is inappropriate in this situation. They

9

did not say that the Court cannot do an exceptional down sentence on its own accord.  It just appeared that the findings needed to be a little clearer that a de minimis violation was the cause for the exceptional down and that the charges or the—the facts in this case were de minimis enough to justify an exceptional down.

. . . .

MS. COIC: That's all I have for the Court today.   But I know that Mr. Clark does want to speak on his own behalf.

THE COURT: All right, thank you.

And, Mr. Clark, you have a right to make any statement you'd like the court to consider before the final sentencing is imposed.  You're not required to make a statement, but you have every right to do so.  Feel free to share anything you'd like.

THE DEFENDANT: Okay, thank you, your Honor.

RP at 14-15.  Clark then spoke about his recovery during the last

three years.

The sentencing court imposed the parties' agreed-upon DOSA.  The court then

offered an exhaustive explanation outlining the reasons for its decision.  Because of the

State's request to reassign any resentencing to another judge, we quote much of the oral

ruling:

The court will make its ruling at this time.  I read the mandate, and I wish that I would have made more clear on the record a couple of things.  First of all, when the court does impose an exceptional down, the court is required by statute, is my understanding, to take into account the purposes, the underlying purposes of the SRA [Sentencing Reform Act].  And that comes from 9.94 A.010 and then also .535.  It directs the court to consider the purposes of the SRA.  Those purposes are as follows: ensure that punishment for a criminal offense is proportionate to the seriousness level of the offense and the offender's criminal history.  The Court of Appeals considered and addressed the criminal history, so I can't step on stare decisis.  But I do want to make clear on the record, which apparently didn't get through in the arguments to the Court of Appeals, the court took into

10

account not just the offender criminal history, which is a numeric SRA score, but the circumstances for compiling and acquiring that criminal history.

So I turn to his criminal history now to articulate for this record what the court meant originally, which is when you look at his criminal history and the reason that his offender score is so high, is because he has one, two, three, four -four prior convictions for domestic violence no-contact order. What the court found important about that or the circumstance that was somewhat compelling to the court, all of them have the same sentencing date. And so when the court is tasked with distinguishing between defendants and attempting to be just, the circumstances of criminal history composition and acquisition does distinguish defendants. Having been a former prosecutor and having been a judge, there is no question that when you look at criminal history and the fact that when a person is sentenced for numerous offenses on one sentencing date versus acquiring criminal history sporadically over time, it is a factor the court should be able to use as a distinguishing factor. I recognize out of respect for stare decisis that the Court of Appeals considered this and they found that my ruling—because the legislature took into account criminal history when creating the ranges, that I was prohibited as a sentencing judge from using that as a distinguishing factor for purposes of an exceptional sentence, because it was considered by the legislature. I frankly disagree with that, respectfully. I understand it's not a trial court's place to second-guess a higher court. But I put on the record that it was my analysis that having all his prior history that contributed to his offender score or rather a substantial portion of it on the DV no-contact orders being on one sentencing date is a distinguishing factor. And I don't think the legislature contemplated that aspect. I would urge that our higher courts take the circumstances of criminal history acquisition into account and allow sentencing courts to use as at least one of the factors. However, given that the Court of Appeals already considered this issue, I will not rely on it today out of respect for stare decisis. But the record should reflect that if I could use that, I would, because it is—it is insightful to sentencing courts to know when and how a person acquired their criminal history, when or how procedurally they acquired their criminal history based on the circumstances they find themselves in at sentencing, if that makes sense. I hope that it does. Apparently—I believe that I mentioned it in the record at the first hearing. But it did not come through, and I don't believe the parties discussed it in front of the Court of Appeals regarding what the court was thinking there.

11

Again, I want the record to be clear. Just for example, if someone is convicted of a crime, they're sentenced, they conclude their sentence and they're later convicted of another crime, they finish their sentence and then they continue to commit more periodic ongoing crimes, that is a circumstance that is more indicative of a likelihood for continued patterns of criminal behavior, versus a situation where someone has acquired past charges all on one sentencing date, has then been sentenced at one hearing and has a resulting high offender score from a single date. The court should be able to account for that. But under current case law, that does not appear to be an appropriate factor for consideration for purposes of exceptional sentencing. And so out of respect for stare decisis, I will not consider it. But I do want the court's thought process to be reflected on the record in case there is another appeal on this case.

So the question is, it looked to the court as if the court could only exclusively rest its head on de minimis conduct or conduct related to the crime in order to impose an exceptional sentence. I do sentencings day in, day out. I literally do them almost every day, sometimes all day. I could count the number of times that I have gone below the state's recommendation on four fingers in my entire judicial career where I've imposed an exceptional sentence below the standard range. Literally, it's been four times where I have—in my six years on the bench where I've imposed an exceptional down sentence contrary to parties' agreements. I cannot ignore my professional wisdom. I had the sense back at that original sentencing and I have the sense now that Mr. Clark has truly rehabilitated himself, which I know defendants come in all the time and say that and I hardly ever believe them. I genuinely believe Mr. Clark. I believed him then. I believe him now. And I can't ignore my professional judgment. Nevertheless, the Court of Appeals indicated that because rehabilitation was not related to the criminal conduct as addressed in their mandate, I should not include that in my calculation for purposes of imposing an exceptional sentence. And out of respect for stare decisis, I therefore won't. But if I could, I would, and I think it should be a relevant factor.

By the way, it was this court's interpretation that the legislature passed the statute in order to give sentencing courts discretion, and in doing so, there's an express directive to consider the underlying purposes of the SRA when considering an exceptional sentence. So just because the legislature considered something or considered—just because the legislature considered a particular body of criteria and then expressly instructed the court to consider that same criteria when deciding whether or

12

not to impose an exceptional sentence, I'm still struggling and troubled, even though I understand it exists in case law and by stare decisis I'm bound. But to me, the more appropriate interpretation is that the legislature has instructed the sentencing courts to look at the same criteria that the legislature looked at, because they want to give courts discretion to implement exceptional sentences but they also want the courts to ensure that when deviating from guidelines, that the purposes of the SRA are heavily considered and that the same considerations they looked at are reexamined by the sentencing court upon any exceptional sentence. And that would be my interpretation. But I also understand that I am not a higher court. And out of respect for stare decisis, I will not follow the express language of that statue. But if I could, I would.

What I would be able to hang my hat on, it looks like, is the de minimis nature of the—of the crime alone. And here, it appears to be an apology letter. But there is dicta in the Court of Appeals' mandate that they also looked at that. And Division III expressed doubt that de minimus conduct alone would likely not support an exceptional down. Of course they sent it back down for me to determine.

I was not presented at this sentencing hearing, nor at the original sentencing hearing, with any information with respect to any other threatening-type messages. It appeared that the communication was benign. Of course, that's still prohibited by law and it still is a crime, because it's communication in violation of a no-contact order. But again, distinguishing factor here. If I'm being intellectually consistent and honest, I'm not able to consider as part of the exceptional sentence the factors that the legislature already considered. I can't honestly say, then, that I would impose an exceptional down sentence solely on de minimus conduct. And so I believe that I'm bound by stare decisis based on the higher case law. For that reason and in deference to the higher courts, I'm reluctantly going to impose the prison-based DOSA sentence. I very reluctantly do so and hope the higher courts change the law to allow for greater justice.

RP at 16-22 (alterations added).

After announcing John Clark's sentence, the resentencing court further stated:

The following cumulative factors in this court's mind give rise to substantial and compelling reasons, but most of them are admittedly not

13

crime-related conduct.  The substantial and compelling aspects arise from the aggregate and collective presence of all the following factors:

(1) procedural history and circumstance of how criminal history was acquired as opposed to simply countable offender score;

(2) de minimus conduct of crime, which is crime-related but not sufficient to impose an exceptional down in isolation;

(3) judicial confidence in credibility of defendant's rehabilitation at time of sentencing with confidence of future law compliance;

(4) judicial confidence in victim's future safety;

(5) following a long and sustained period of sobriety, concern over misuse of state funds for a DOSA program that is not needed to address this particular person's substance abuse issues which seem to have been remedied; thus, conservation of limited local and state resources;

(6) adjusting for fairness based on unusually aggressive disposition of the particular assigned DPA at original sentencing.  If Mr. Martin was handling this case, I have no doubt this case would have resulted in a different recommendation, because Mr. Martin is a wise and reasonable attorney who evaluates the totality of case dynamics rather than simply a mere calculation of evidentiary potential.  The wide variation in prosecutor dispositions should be accounted for by the sentencing court and adjusted for fairness.  This factor is very difficult for sentencing courts to address on the record, as they draw disqualifications and can appear as unfair comments;

(7) concern for unduly vindictive or unduly sensitive victims who heavily influence negotiations.  The victim impact statement spoke to the victim being upset with past relationship dynamics rather than impact from the charged crimes themselves.  The court formed the impression from courtroom observation that the victim was motivated by vindictiveness and jealousy that defendant had found a new wife.  These factors are extremely difficult to speak to on the record and cause victims understandable anger towards the court if spoken about.

RP at 22-24 (emphasis added).

No. 39710-6-III
*State v. Clark*

LAW AND ANALYSIS

John Clark appeals his resentencing, which consists of a DOSA sentence of prison for three years and community custody for three years. Clark contends the superior court misread this court's 2023 ruling as limiting, if not removing, from him discretion to impose an exceptional downward sentence. According to Clark, the resentencing court abused its discretion when determining it could not consider the nature of Clark's earlier restraining order violations and his post-offense rehabilitation at resentencing. Clark asks for a third sentencing.

In response the State asks us to decline reviewing the merits of John Clark's appeal because Clark allegedly did not preserve error. Clark did not ask for a downward exceptional sentence at resentencing. In the alternative, assuming Clark asked for an exceptional sentence, the State asks that we decline to review the appeal because Clark violated the plea agreement. Assuming we reach the merits of Clark's appeal, the State argues that the trial court correctly understood the depth and height of its discretion and correctly considered the factors given by the legislature for a downward sentence. Finally, the State asks that, if we remand again for resentencing, we assign the resentencing to a different superior court judge.

*Issue 1: Whether this court should decline to review John Clark's arguments?*

*Answer 1: No.*

15

The State argues that, under RAP 2.5, this court should refuse to review John Clark's assignment of error because Clark did not present his current theory of relief to the resentencing court. Clark did not argue for an exceptional downward sentence based on his four earlier offenses being adjudicated on the same day, the minimal nature of his offense conduct, or his rehabilitation after his current conviction.

RAP 2.5(a) provides that this court "*may* refuse to review any claim of error which was not raised in the trial court." (Emphasis added.) We note that the rule employs the permissive term "may," not the mandatory word "shall." Since territoryhood, Washington courts have construed the word "may" when used in a statute as permissive and as conferring discretion on the court. *Rios v. Department of Labor & Industries*, 145 Wn.2d 483, 508, 39 P.3d 961 (2002); *In the Matter of the Guardianship of Johnson*, 112 Wn. App. 384, 387, 48 P.3d 1029 (2002). Accordingly, RAP 2.5(a)'s use of the term "may" indicates the appellate court enjoys discretion as to whether to refuse or permit review. *Roberson v. Perez*, 156 Wn.2d 33, 39, 123 P.3d 844 (2005); *State v. Ford*, 137 Wn.2d 472, 477, 484–85, 973 P.2d 452 (1999). Stated differently, nothing in RAP 2.5(a) expressly prohibits an appellate court from accepting review of an issue not raised in the trial court. *State v. Russell*, 171 Wn.2d 118, 122, 249 P.3d 604 (2011).

We agree with the State that John Clark did not argue for an exceptional sentence at resentencing, but we accept review because of the unusual circumstances behind this appeal. Those circumstances include the superior court's justified frustration about the

byzantine nature of and constrictions imposed by the SRA, his wishing to order an exceptional sentence based on Clark's rehabilitation, the absence of any threatening communications, and four prior violations being sentenced on the same day.

John Clark did not expressly ask for a downward sentence because of the plea agreement and because of this court's warning in our February 21, 2023 decision. We wrote:

> Now that there is a well-defined basis for an exceptional sentence downward, defense counsel must take care not to undermine the parties' plea agreement and suggest the court impose anything other than the agreed DOSA.

CP at 69.

*Issue 2: Whether John Clark violated the plea agreement?*

*Answer 2: No.*

On the assumption that we rule that John Clark preserved error by arguing before the resentencing court in favor of an exceptional downward sentence, the State contends that Clark violated the plea agreement. As already indicated, however, we agree with the State that Clark did not argue such a position before the superior court.

A plea agreement is a contract. *State v. Sledge*, 133 Wn.2d 828, 838-39, 947 P.2d 1199 (1997). Because plea agreements concern an accused's fundamental rights, due process considerations are also at play. *State v. Harris*, 102311-1, 2024 WL 4902512, at *1 (Wash. Nov. 27, 2024). Due process requires the prosecutor to act in good faith and

17

prohibits undercutting the terms or by conduct evidencing an intent to circumvent the terms of a plea agreement. *State v. Harris*, 102311-1, 2024 WL 4902512, at \*1 (Wash. Nov. 27, 2024). Defendants owe the same duty of good faith. *See In the Matter of Pers. Restraint of Breedlove*, 138 Wn.2d 298, 307, 979 P.2d 417 (1999). A breach can occur when a party offers unsolicited information through a report, testimony, or argument that undercuts the party's obligation under the agreement. *State v. Harris*, 102311-1, 2024 WL 4902512, at \*1 (Wash. Nov. 27, 2024). The State, and presumably the defendant, is not obligated to enthusiastically make a sentencing recommendation, but it must participate in sentencing proceedings, answer the court's questions with candor, and cannot withhold relevant information regarding the plea agreement. *State v. Sledge*, 133 Wn.2d 828, 840, 947 P.2d 1199 (1997). Whether a plea agreement is breached is an objective inquiry. *State v. Van Buren*, 101 Wn. App. 206, 213, 2 P.3d 991 (2000).

The State emphasizes the rule that a breach can occur when a party offers unsolicited information through a report, testimony, or argument that undercuts the party's obligation under the agreement. John Clark did not violate this rule. The resentencing court asked for input from both sides at to events that occurred since the original sentencing. The court specifically asked about Clark's sobriety. The court invited witnesses on behalf of the State and witnesses on behalf of Clark to speak. Much of what Clark uttered responded to comments made by the victim in her letter to the court. If John Clark violated the plea agreement, the State violated the agreement first.

18

Before resentencing even began, the State handed a letter to the court from the ex-wife. The State asked the court to consider the letter when resentencing Clark.

We find an ambiguity in the plea agreement. The agreement read: "The prosecuting attorney will make the following recommendation to the judge: Agreed recommendation for Prison DOSA." CP at 7. We are uncertain whether this language required both parties to recommend a DOSA, as opposed to only the prosecution.

Defense counsel, during resentencing, commented that this court did not preclude an exceptional downward sentence, but instead ruled that the court should clarify any finding of a negligible violation of the no-contact order. Counsel, however, recognized being bound by the parties' original joint recommendation for the prison and community custody DOSA sentence.

Finally, we note that the State argues on appeal that John Clark did not preserve error because he did not ask for a downward sentence during resentencing. The State takes contradictory positions when arguing that Clark violated the plea agreement.

*Issue 3: Whether the trial court abused its discretion in holding it did not have the authority to impose an exceptional sentence below the standard range because of the minimal nature of the violations of the no-contact order?*

*Answer 3: Yes.*

John Clark argues this court should remand for resentencing because the superior court misunderstood its sentencing discretion. Clark maintains the trial court wanted to

19

impose an exceptional sentence below the standard range based on the circumstances of his prior no-contact order violations and his post-offense rehabilitation. He argues the court abused its discretion in determining that these factors did not constitute substantial and compelling reasons to warrant such a departure. In making this argument, he asserts that this court, in our 2023 opinion, approved as mitigating factors supporting a downward sentence both the nature of his prior no-contact order violations and his post-offense rehabilitation.

The lengthy RCW 9.94A.535 governs exceptional sentences. The statute begins:

> The court may impose a sentence outside the standard sentence range for an offense if it finds, considering the purpose of this chapter, that there are substantial and compelling reasons justifying an exceptional sentence. . . .
> (1) Mitigating Circumstances—Court to Consider
> The court may impose an exceptional sentence below the standard range if it finds that mitigating circumstances are established by a preponderance of the evidence. The following are illustrative only and are not intended to be exclusive reasons for exceptional sentences.

None of the listed circumstances apply to John Clark's crimes. Clark does not contend that any listed circumstance applies.

Of course, as indicated in the opening sentence of RCW 9.94A.535(1), the sentencing court may base an exceptional downward sentence on a factor other than one listed. Nevertheless, to be legally valid, an unlisted mitigating factor must be one that has not already been contemplated by the legislature, and it must be one that relates to the

defendant's offense conduct, not simply the defendant's personal character or circumstances. *State v. Law*, 154 Wn.2d 85, 101, 103, 110 P.3d 717 (2005).

Contrary to John Clark's contention, this court did not, in its 2023 decision, rule that the sentencing court could base an exceptional sentence on rehabilitation. We instead wrote that post-offense rehabilitation is a factor specific to Clark, not his offense conduct. A sentencing court's determination that a standard range sentence would not advance the offender's need for rehabilitation does not suffice for a departure from the standard range. *State v. Amo*, 76 Wn. App. 129, 133, 882 P.2d 1188 (1994). Thus, we precluded rehabilitation as a factor justifying an exceptional downward sentence.

John Clark argues that our decision in *State v. Dunbar*, 27 Wn. App. 2d 238, 532 P.3d 652 (2023), permitted the superior court to consider his rehabilitation. We did rule in *State v. Dunbar* that the court could consider rehabilitation on resentencing, but we issued such a ruling only in the context of sentencing inside the standard range. We issued no ruling on rehabilitation justifying an exceptional sentence.

The superior court, when resentencing John Clark, wanted to take into account the purposes underlying the SRA as found in RCW 9.94A.010. In particular, the court wished to conserve state resources expended if the court returned Clark to incarceration. RCW 9.94A.010 declares:

> The purpose of this chapter is to make the criminal justice system accountable to the public by developing a system for the sentencing of

felony offenders which structures, but does not eliminate, discretionary decisions affecting sentences, and to:

(1) Ensure that the punishment for a criminal offense is proportionate to the seriousness of the offense and the offender's criminal history;

(2) Promote respect for the law by providing punishment which is just;

(3) Be commensurate with the punishment imposed on others committing similar offenses;

(4) Protect the public;

(5) Offer the offender an opportunity to improve himself or herself;

(6) Make frugal use of the state's and local governments' resources; and

(7) Reduce the risk of reoffending by offenders in the community.

We agree with the superior court that, although a court may consider the statutory purposes once it finds a sufficient mitigating circumstance, the court may not base an exceptional downward sentence solely on one of the purposes. The purposes of the SRA enumerated in RCW 9.94A.010 are not in and of themselves mitigating circumstances. *State v. Alexander*, 125 Wn.2d 717, 730 n.22, 888 P.2d 1169 (1995). Rather, they may provide support for the imposition of an exceptional sentence once a mitigating circumstance has been identified by the trial court. *State v. Alexander*, 125 Wn.2d 717, 730 n.22 (1995); *State v. Rice*, 159 Wn. App. 545, 573, 246 P.3d 234 (2011), *aff'd on other grounds*, 174 Wn.2d 884, 279 P.3d 849 (2012).

The superior court also wished to consider not only John Clark's numeric criminal history, but the circumstances behind the compilation of the history. The court emphasized that a prior court sentenced Clark for four no-contact order violations on the

22

same day. The court distinguished between an offender who commits four crimes and after each crime goes to jail and then is released before the next crime. According to the superior court, this hypothetical offender will more likely reoffend than will Clark. We agree, however, with the superior court that the SRA does not permit employment of this circumstance because the legislature already considered such when crafting the SRA.

The superior court wished to, but deemed the law prohibited it to, ground an exceptional downward sentence on confidence in the victim's future safety, the aggressiveness of the first prosecuting attorney, and the possible vindictiveness of the victim. We agree because RCW 9.94A.535(1) does not list those circumstances or factors as mitigating and they fail to relate to John Clark's criminal behavior.

The superior court commented that our earlier decision allowed him to base an exceptional sentence only on the minimal nature of his offenses. We agree absent any new reason forwarded by John Clark at a resentencing. The negligible nature of the crime, although not an enumerated reason in RCW 9.94A.010, relates to the offense's conduct. In Clark's prosecution the minimal conduct could include all contact being in writing, no utterance of a threat, and an apology. As indicated in our 2023 decision, Clark's conduct differs from the conduct of many other persons violating a no-contact order. Other offenders typically issue threats, stalk, or cause injury. Of course, the superior court must also deem the factor of minimal offense conduct to be a substantial and compelling reason justifying an exceptional sentence. RCW 9.94A.535(1).

23

At one point in the superior court's oral ruling, the court commented: "I can't honestly say that I would impose an exceptional down sentence solely on de minimis conduct." RP at 22. Later, the superior court remarked: "But there is dicta in the Court of Appeals' mandate that they also looked at that. And Division III expressed doubt that de minimis conduct alone would likely not support an exceptional down." RP at 21. Based on these two passages, we remain uncertain whether the superior court would grant an exceptional downward sentence solely on minimal conduct. A trial court errs when it operates under the mistaken belief that it did not have the discretion to impose a mitigated exceptional sentence for which the offender may have been eligible. *State v. McFarland*, 189 Wn.2d 47, 56, 399 P.3d 1106 (2017).

After reviewing the superior court's resentencing ruling and the guiding law, we affirm that the superior court may grant an exceptional downward sentence based solely on the possible negligible nature of John Clark's order violations. We remand to the superior court to explicitly determine whether it will grant an exceptional downward sentence based solely on the minimal offense conduct and to determine whether any minimal conduct constitutes a substantial and compelling reason to depart from standard range sentencing. We encourage the court, as we did in our 2023 opinion, to take testimony about the impact on Jane because of the violations of the no-contact orders.

*Issue 4: Whether we should remand to a different superior court judge?*

*Answer 4: No.*

24

The State asks us to assign the resentencing to a different superior court judge in the event that we remand for another sentencing. We decline to do so.

Generally, a party seeking a new judge files a motion for recusal in the trial court, which allows the challenged judge to evaluate the grounds for recusal and permits the parties to develop a record adequate to determine whether the judge's impartiality might reasonably be questioned. *State v. McEnroe*, 181 Wn.2d 375, 386, 333 P.3d 402 (2014). But a party may seek reassignment for the first time on appeal, which is usually done when the trial judge will exercise discretion on remand regarding the very issue that triggered the appeal and has already been exposed to prohibited information, expressed an opinion as to the merits, or otherwise prejudged the issue. *State v. Solis-Diaz*, 187 Wn.2d 535, 540, 387 P.3d 703 (2017). We grant the remedy of reassignment on appeal only in limited circumstances. *State v. McEnroe*, 181 Wn.2d 375, 386 (2014). Even when a trial judge has expressed a strong opinion as to the matter appealed, the reviewing court does not reassign the case if an appellate opinion offers sufficient guidance to effectively limit trial court discretion on remand. *State v. Solis-Diaz*, 187 Wn.2d 535, 540 (2017). Erroneous rulings do not form grounds for recusal. *State v. Solis-Diaz*, 187 Wn.2d 535, 538 (2017). But when review of facts in the record shows the judge's impartiality might reasonably be questioned, the appellate court should remand the matter to another judge. *Sherman v. State*, 128 Wn.2d 164, 206, 905 P.2d 355 (1995).

We conclude that a reasonable person would not question the impartiality of the assigned superior court judge. Instead, the record shows a cautious, conscientious, and intelligent judge attempting to execute a just and fair sentence within the restraints of the SRA. The superior court assessed credibility of parties and commented on steps taken by one of the prosecuting attorneys in the case. A trial court must constantly adjudge the credibility of the parties and witnesses. Sometimes the prosecuting attorney's office needs counsel from the superior court. None of these actions disqualify the judge. The court also complimented one of the prosecuting attorneys. As recognized by the superior court, commenting on a witness or an attorney can appear as unfair comments when they are not. We commend the judge for his forthrightness.

The State also suggests that the superior court criticized this court during the resentencing oral ruling. We are not offended or harmed by critical comments of a superior court judge. Regardless, the superior court's comments related more to frustration with the SRA rather than with this court.

## CONCLUSION

We remand for another sentencing of John Clark consistent with our opinion.

No. 39710-6-III
*State v. Clark*


A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Fearing, J.

WE CONCUR:


_____       _____
Lawrence-Berrey, C.J.                                Cooney, J.